EDWIN YOUNG, as Executor, etc., Respondent, *v.* JAMES D. LEARY, Appellant.

Defendant guaranteed the performance by one McK. of a contract contained in a charter party, under which he hired a propeller from the W. S. Co., for one year from October 17, 1884, to be used in southern waters. McK. agreed to insure the vessel for one year for a certain amount, and assumed "all fire, marine and other risk of damage that may happen to said vessel, \* \* \* which is not covered by fire and marine insurance," so provided for. McK. procured the insurance as agreed. Subsequent to October 17, 1885, the vessel was burned at sea In an action upon the guaranty *held,* that the risks assumed by McK. were only such as were not covered by the insurance which he agreed to and did procure, and were limited to the period included in the charter party, and so, no liability was incurred by him or by defendant under said clause of the instrument.

By the charter party McK. agreed, on termination of the charter, to deliver the vessel to the company in New York harbor. *Held,* that to this agreement a condition was implied of the continued existence of the vessel, and in case it was destroyed without fault of McK. before breach of the agreement, so that delivery was impossible, he was excused therefrom.

*Harmony* v. *Bingham* (12 N. Y. 99), distinguished.

But *held,* that as McK. failed to deliver the vessel at the end of the term, if the failure was not excused, there was a breach of the agreement, and the subsequent destruction of the vessel without his fault furnished no excuse for such breach.

Defendant claimed that the obligation to deliver by October 17, 1885, was waived. It appeared that sometime prior to the expiration of the year, while the vessel was in southern waters, negotiations were in progress between the parties, in which defendant participated, for the purchase of the vessel by McK., and that during such negotiations the time for the delivery passed. Subsequent to that time terms of sale were agreed upon and a mortgage was sent to McK., to execute as security for part of the purchase price. These negotiations were finally abandoned, and thereupon the vessel was sent north to be delivered, and was burned while on the way. The referee substantially found that there was a waiver of punctual delivery at the end of the term occasioned by delay in the negotiations for a purchase, but decided that such waiver was not material, as defendant, although a surety, was a party to the transactions causing the delay. *Held,* error ; that if there were such a waiver and the time for delivery impliedly extended until a reasonable time after failure of the negotiations, and if during such extended time the loss

occurred without the fault of McK., there was no breach of the agreement on his part, and so no liability of defendant as his surety.

Defendant, after the expiration of the term and prior to the sending of the vessel north for delivery, procured an insurance upon her against loss by fire, for his own benefit, as the referee found; this he collected and retained the money for his own use. *Held,* that this did not render him liable under the pleadings in this action.

(Argued October 6, 1892; decided November 29, 1892.)

APPEAL from judgment of the General Term of the Supreme Court in the third judicial department, entered upon an order made November 5, 1891, which affirmed a judgment in favor of plaintiff entered upon the report of a referee.

This was an action upon a guaranty.

The facts, so far as material, are stated in the opinion.

*Esek Cowen* for appellant. The referee committed a grave error in holding that the covenant to return the vessel in good condition was an absolute engagement to return it in any event, or pay the owner its value in case of a failure to return. McKay, the charterer, was not liable in case of destruction by fire, without negligence or fault on his part, and *a fortiori,* the defendant, as surety, was not liable. (3 Black. Comm. 453; *Foster* v. *Essex Bank,* 17 Mass. 500; *Ames* v. *Belden,* 17 Barb. 513; *Hyland* v. *Paul,* 33 id. 241.) This judgment for the value of the vessel and interest cannot be sustained, as the fire which destroyed this boat was not due to any negligence or fault of the defendant's principal. (Schouler on Bail, § 23; *Wilson* v. *S. P. R. R. Co.,* 62 Cal. 172; *Lamb* v. *C. & A. R. R. & T. Co.,* 46 N. Y. 278; *Wylie* v. *N. Bank,* 119 U. S. 370; *Claflin* v. *Meyer,* 75 N. Y. 762; *Collins* v. *Bennett,* 46 id. 491.)

*A. T. Clearwater* for respondent. The claim was one that could be assigned. The assignment was valid and the action properly brought by the plaintiff's testator. (Code Civ. Pro. §§ 1909, 1910.) The Washburn Steamboat Company had the power to assign the claim to the plaintiff's testator. (*Peterson*

v. *C. Bank*, 32 N. Y. 20 ; *Bank of Augusta* v. *Earle*, 13 Pet.
519.)　In the absence of proof of the character of the
law of another state the presumption is that it corresponds
with ours, and the court, in the absence of allegations and
proof of a foreign law, will apply our own to the case.
(*McBride* v. *F. Bank*, 26 N. Y. 450 ; *Savage* v. *O'Neil*, 44
id. 298 ; *Cutler* v. *Wright*, 22 id. 472 ; *Cheeney* v. *Arnold*, 15
id. 353 ; *Monroe* v. *Douglass*, 5 id. 447 ; *Cohen* v. *Kelly*, 3 J.
& S. 42 ; *C. S. Bank* v. *Bidwell*, 29 Barb. 345 ; *Robinson* v.
*Dauchy*, 3 id. 20 ; *Sherrill* v. *Hopkins*, 1 Cow. 103.)　The
plaintiff's testator had the legal right to purchase the claim,
subject only to the equitable right of a non-assenting stock-
holder, or a creditor of the Washburn Steamboat Company to
set aside the assignment before innocent third parties were
prejudiced.　And this was so, notwithstanding the fact that
he was a director, and present and voted for the resolution
directing the assignment. (*Cornell* v. *Clark*, 104 N. Y. 451 ;
*Barnes* v. *Brown*, 80 id. 528.)　The defendant, having
received the benefits of the contract, is not in a position to
raise the question that the assignment by the Washburn Steam-
boat Company to the plaintiff's testator was *ultra vires*.　(*D.
M. Co.* v. *Roeber*, 106 N. Y. 473 ; *R. L. R. Co.* v. *Roach*, 97
id. 378 ; *Mayor, etc.*, v. *Sonneborn*, 113 id. 426 ; *Mayor, etc.*,
v. *Huntington*, 114 id. 633 ; *W. A. Co.* v. *Barlow*, 68 id. 34 ;
*Palmer* v. *C. H. Cemetery*, 122 id. 435 ; Morawetz on Priv.
Corp. §§ 142, 144 ; *Douglas* v. *Bawles*, 94 U. S. 104 ; *Palmer*
v. *Lawrence*, 3 Sandf. 161 ; *Brower* v. *Appleby*, 1 id. 161 ;
*C. Society* v. *Perry*, 6 N. H. 164 ; *Williams* v. *Cheney*, 3
Gray, 220 ; *L. Bank* v. *Jacoby*, 10 Hun, 143 ; *C. Bank* v.
*Smitt*, 17 id. 487 ; *Henriquez* v. *D. W. I. Co.*, 2 Ld. Raym.
1535 ; *Dunn* v. *Van Houton*, 5 Hals. 270 ; *C. Society* v.
*Perry*, 6 N. H. 164 ; *A. S. Church* v. *Lovott*, 1 Hall, 213 ;
*John* v. *F. Bank*, 2 Black, 367 ; *Ryan* v. *Valandingham*, 7
Ind. 416 ; *Dutchess* v. *Davis*, 14 Johns. 245 ; *Hartrant* v.
*Bank*, 2 Mo. 269 ; *Hughes* v. *Bank of Somerset*, 5 Litt. 47 ;
*W. M. Inst.* v. *Harding*, 11 Cush. 385 ; *W. C. Co.* v. *Hath-
away*, 8 Wend. 480 ; *U. S. Bank* v. *Sterns*, 15 id. 316 ; *People*

v. *R. Co.* 20 Barb. 518; *C. Bank* v. *Smith,* 9 Abb. Pr. 168.) The defendant not having pleaded that the plaintiff was not the real party in interest cannot avail himself of that defense on the trial. (*White* v. *Drake,* 3 Abb. [N. C.] 133.) The plaintiff's testator was the real party in interest, and the assignment cannot be attacked collaterally. (*Sheridan* v. *Mayor, etc.,* 68 N. Y. 30; *Morris* v. *Tuthill,* 72 id. 375; *Brown* v. *Rychman,* 12 How. Pr. 313; *Fosdick* v. *Groff,* 22 id. 158; Pom. on Rights & Rem. 160; 1 E. D. Smith, 142; 4 How. Pr. 204; *Durgin* v. *Ireland,* 14 N. Y. 322; *Meagher* v. *Claghorn,* 44 id. 349; *Allen* v. *Brown,* Id. 231; *Cummings* v. *Morris,* 25 id. 627; *Bank of New Haven* v. *Perkins,* 29 id. 554; *Brown* v. *Penfield,* 36 id. 473; *James* v. *Chalmers,* 6 id. 208; Pom. on Rem. 209.) The contract of suretyship was duly executed and the defendant having had ample opportunity to acquaint himself with its contents is estopped from denying the validity of its execution. (*Phillip* v. *Gallant,* 62 N. Y. 256; *Fox* v. *Parker,* 47 Barb. 541; *Grant* v. *Hotchkiss,* 26 id. 63; *Ruggles* v. *Holden,* 3 Wend. 216.) The contract of surety has not been vitiated by any act of the parties to either agreement. (42 N. Y. 44; *Anderson* v. *Read,* 106 id. 333; *Brady* v. *Cassidy,* 104 id. 147; *Dietz* v. *Farish,* 79 id. 520.) The construction of a contract of a surety is the same as of other contracts. (62 Barb. 351; 3 Wend. 216; 63 N. Y. 383; 7 Pet. 113; *Gates* v. *McFee,* 3 Kern. 232; *Poppenhusen* v. *Seeley,* 3 Keyes, 150; *Hamilton* v. *Van Rensselaer,* 43 N. Y. 24; *Melick* v. *Knox,* 44 id. 677; *Bank* v. *Strever,* 18 id. 502; *In re Lawrence,* 2 How. 426; *In re Lee,* 10 Pet. 482; *In re Bell,* 1 Hun, 169; *In re Mauran,* 16 Pet. 528.)

PECKHAM, J. The questions in this case arise out of a charter party executed on the 17th of October, 1884, by the Washburn Steamboat Co., and one McKay, for whom the defendant became surety. The company on the day mentioned let and McKay hired the steam propeller called the Alicia A. Washburn, of which the company was the owner,

for the term of twelve months from October 17, 1884, to be employed in lawful trade between Key West and other points on the West Florida coast on the terms and conditions mentioned in the charter party. Among other provisions thereof was one by which McKay agreed to procure a fire and marine insurance policy for $27,000 for one year on such boat, in the name of the company and to pay the premium thereon as an additional consideration of the charter. McKay also agreed to pay a certain rent per month for the use of the boat, commencing on the 17th of October, 1884, and also agreed that on the termination of the charter he would "deliver the said steam propeller to the Washburn Steamboat Company, or their legal representatives, in New York harbor in the same good condition as she is now in, ordinary wear and tear excepted." Another provision in the charter party was as follows: "That said McKay hereby assumes all fire, marine and other risks of damage that may happen to said vessel and also assumes all liability of every kind and nature, for which said propeller or its owners may be responsible during the term of this charter, which is not covered by fire and marine insurance hereinbefore mentioned.

McKay procured in the name of the company a fire and marine policy of insurance upon the vessel for $27,000, for one year from October 17, 1884, and paid the premium thereon as he had agreed to do in the charter party.

The vessel was burned at sea in January, 1886.

The defendant, subsequent to October 17, 1885, but prior to the time when the vessel was sent north, caused her to be insured against loss by fire for the sum of $17,000, and the vessel, when destroyed by fire, was insured in favor of defendant for that sum, which he thereafter collected and has since retained for his own use and benefit. The defendant claims that, by reason of certain facts which will be hereafter adverted to, the plaintiff or his assignor waived the exact fulfillment of the agreement of McKay to deliver the vessel to the company on the 17th of October, 1885.

The company duly demanded of the defendant that he

should cause the vessel to be delivered to it or pay the value thereof, which defendant omitted to do. The company then assigned its claim to Thomas Cornell, who commenced this action to recover from the defendant the value of the vessel because of the failure of McKay to deliver it to the company on the 17th of October, 1885, as he had agreed to do. Subsequent to the commencement of the action Cornell died, and it was thereupon duly revived in the name of the plaintiff as the executor of the will of Cornell. The action was tried before a referee, who gave judgment in favor of the plaintiff for the value of the vessel, $22,000, and interest thereon from the 17th of October, 1885, and also the sum of $1,232.34, with interest from same date, being the amount due and unpaid for the use and hire of the vessel. The judgment having been affirmed at the General Term the defendant has appealed here.

Before adverting to the facts which occurred while the vessel was in the possession of McKay, the charterer, it will be convenient to determine the nature and extent of his obligations by virtue of the charter party.

He agreed that he would procure a fire and marine insurance policy for one year in the name of the steamboat company for $27,000 and pay the premium thereon. It is conceded that he did so. This policy expired, by its terms, on the 17th of October, 1885, and it was not renewed. There is no provision of the charter party providing for any renewal of such a policy. He also assumed during the term of the charter all fire, marine and other risks of damage that might happen to the vessel not covered by fire and marine insurance as thereinbefore mentioned. Also all liability during the same term of every kind and nature for which the vessel or its owners might be responsible. Thus during the period of the running of the charter party the risks of McKay, as assumed by him, were only such fire, marine or other risks of damage as were not covered by the fire and marine insurance which he had already agreed to, and which in fact he did procure. What such risks were. is not very material, although there are risks

not covered by such a policy. At any rate, as McKay procured the policy which he agreed to procure, and for the period agreed upon, no liability for the loss of the vessel attaches to him under this clause of the charter party. The cause of the loss, we may assume, was from one of the risks which would have been covered by the fire and marine policy had that policy been in force. It had expired by its own limitation, and McKay was under no obligation to renew it. He had never in terms assumed a liability to refund for a loss of this kind. His agreement to respond for losses not covered by the insurance policy spoken of was limited to the period included in the charter party, one year from October 17, 1884. Thus, from whatever cause the loss occurred, the liability of McKay (and consequently of defendant) must be sought from some other clause of the charter party than the one now spoken of.

Another obligation assumed by McKay was to pay the rent as mentioned in the agreement, but there is no materiality in that liability so far as this question is concerned.

The remaining obligation of McKay under this charter party is contained in that provision by which he agreed in the language already quoted, to deliver the vessel to the company in New York harbor.

It has been claimed on the part of the plaintiff in the courts below, and it is now urged here, that this promise to deliver was on its face an absolute and unconditional one and a failure to fulfill it would not be excused by the entire destruction of the vessel before breach and without fault on the part of the charterer. It is true that the vessel was not destroyed at the time when by the terms of the original promise McKay had bound himself to deliver it in New York harbor. The question is whether the contract to deliver was absolute and only to be complied with by an actual delivery within the time agreed upon, or whether a destruction of the thing hired before breach and without the fault of him who hired it would not absolve the latter from his contract. If it would there is the further question whether the facts herein do not show

a waiver of the contract to deliver at the specified date and an implied extension of the time for such delivery and the destruction of the vessel within the time thus extended without the fault of the hirer. Or at least whether the facts proved were not enough to permit a finding of the fact of such waiver and extension.

The case of *Harmony* v. *Bingham* (12 N. Y. 99) is one of the leading cases of that class which must have controlled the judgments of the courts below in the case at bar. It was there reiterated as a principle well founded in the law of contracts, that inevitable accident or any unforeseen contingency not within the control of the party promising was no defense to an action founded upon the express promise to do the thing and a failure of performance. An act of God, it was said, would excuse a party from performing a duty created by law, but not where such party had unconditionally engaged by express contract to perform. It is argued that here is an express promise to deliver this vessel in the harbor of New York, and as the promise was not fulfilled the promisor is liable and hence the liability of the defendant as his surety. We do not think that the law applicable to the class of cases of which that of *Harmony* v. *Bingham* (*supra*) is a conspicuous example applies here.

The contract in this case comes as it seems to us under another class which relates to the hiring for use of the thing hired and where an express contract is made to redeliver the article hired upon the determination of the term of hiring. Even in such cases of express contract, there is implied a condition of the continued existence of the thing which is the subject of the contract, and if it perish without any fault of the hirer, so that redelivery becomes impossible, the hirer is excused. If a horse be delivered to one under an express promise to redeliver when demanded, and the horse die before demand and without fault on the part of the bailee, he is excused. (*Williams* v. *Lloyd*, W. Jones, 179; *Sparrow* v. *Sowgate*, Id. 29.) Mr. S. Martin Leake in his Digest of the Law of Contracts, at page 706, says: "The authorities estab-

lish the principle that where from the nature of the contract it appears that the parties must from the beginning have known that it could not be fulfilled, unless when the time for the fulfillment of the contract arrived, some particular specified thing continued to exist, so that when entering into the contract they must have contemplated such continued existence as the foundation of what was to be done, then in the absence of any express or implied warranty that the thing shall exist, the contract is not to be construed as a positive contract, but as subject to an implied condition that the parties shall be excused in case before breach the contract becomes impossible from the perishing of the thing without the default of the contractor."

Several cases are referred to in support of this proposition. Among them are those in the note to *Hall* v. *Wright* (96 Eng. Com. L. R. 745, at bottom of page 795); *S. C.* (El., Bl. & El. 745); *Taylor* v. *Caldwell* (3 Best & Smith, 826); *S. C.* (113 Eng. C. L. 826). BLACKBURN, J., says, in last case, that the implication in an express contract of this nature that the thing itself shall be in existence when the person is called upon to fulfill his contract, tends to further the great object of making the legal construction such as to fulfill the intention of the parties to the contract, for in the course of affairs men in making such contracts in general would, if it were brought to their minds, say that there should be such a condition. (See also *Appleby* v. *Myers*, L. R. [2 Com. Pl.] 650, per BLACKBURN, J., 658.) There is no question that a party can, if he so please, bind himself to deliver, notwithstanding the thing may perish, which he contracts to deliver. He does not thus bind himself by the use of the ordinary language as contained in this charter party. The above cases show this to be true.

When language like that found in this agreement is used, the condition of continued existence is implied, and as thus interpreted it creates nothing more of an obligation than that which the law raises without any such promise. When language is used which does no more than express in terms the same obligation which the law raises from the facts of the transaction

itself, the party using the language is no further bound than he would have been without it. So it was held in the case of *Ames* v. *Belden* (17 Barb. 513), where the defendant was sued for its value for not returning a steamboat according to the condition of the charter party, by which defendant agreed to return the same at the expiration of the term in as good condition as it then was, excepting ordinary use and wear. The court said the language must be held to have reference to the ordinary obligation of such a bailee to return the article hired, and defendant was exempt if before the time arrived the article had been destroyed without his fault. This is only another way of saying that an obligation expressed in such language carries with it an implied condition that the article to be returned shall be in existence at the time when the obligation to return arises, and if in the meantime it has been destroyed without the default of the promisor, he is not bound by his contract thus expressed. The case is thus entirely supported by the cases above cited.

To the same effect is the case of *Hyland* v. *Paul* (33 Barb. 241).

The same principle has been held operative in covenants or agreements contained in leases of real estate which included buildings, and where the lessee has agreed to deliver possession of the same at the expiration of the lease in the same condition as at the date of the lease, natural wear and tear excepted. This obligation is subject to the implied condition that the building shall be in existence at the end of the term, and if before that time it was burned down without the default of the tenant, he is held not liable under his contract. ( *Warner* v. *Hitchins*, 5 Barb. 666, Genl. Term; *McIntosh* v. *Lown*, 49 id. 550 at 555; 1 Wood's Land. & Ten. [2d ed.] 811, 813, notes; 1 Taylor Land. & Ten. [8th ed.] § 360, latter part of section.)

It is otherwise if the lessee has covenanted to repair or rebuild. (*McIntosh* v. *Lown, supra ; Phillips* v. *Stevens*, 16 Mass. 238.)

It seems to me as if authorities are not required upon the

proposition that in a contract containing the ordinary language providing for redelivery, an implication of continued existence of the thing to be returned is to be made, for, to again quote the language used by Mr. Justice BLACKBURN in *Taylor* v. *Caldwell* (*supra*): "In the course of affairs men in making such contracts in general would, if it were brought to their minds, say that such should be the condition." There is nothing in the other portions of the charter party which affects in any way to the detriment of the defendant this particular question. If there had been no provision for insurance, and the vessel had been destroyed by fire before the 17th of October, 1885, and without the fault of McKay, it seems to me plain that neither he nor his surety, the defendant here, would be liable on the promise to deliver the vessel in the harbor of New York. The provision for insurance was complied with by McKay, and hence no liability attaches by reason of it.

We are thus brought to the consideration of the question of waiver, or of the extension of the time for the fulfillment of the promise of McKay to deliver the vessel. It was not destroyed before the 17th of October, 1885, the time when McKay was bound by his promise to deliver it to the owners in New York harbor, and McKay failed to make such delivery, and consequently, if that failure be not excused, there was a breach of his agreement, and the subsequent destruction of the vessel without his fault would furnish no excuse for such breach. The defendant claims that this obligation to deliver by October 17, 1885, was waived by the action of the officers of the steamboat company. From the findings and additional findings of the referee and the evidence which has been returned, it seems that, some time before the specified date and while the vessel was in southern waters, negotiations were in progress, through McKay's agent or broker in New York, with the officers of the company for the purchase of the vessel by McKay, who wanted to continue to use it in the Florida trade, and that during these negotiations the time for the delivery in New York passed. Subsequent to that time the terms of sale were substantially agreed upon, the vessel being

still to the knowledge of the company in southern waters. On the twenty-eighth of October, one of the officers of the company sent to McKay, who was then at Tampa in Florida, a mortgage upon the vessel to be executed by him as a security for the payment of the purchase money, and to be returned to the company after it was executed. The negotiations finally fell through and were abandoned, and in the last of December or first part of January, McKay sent the vessel north to be delivered, and on its voyage it was totally destroyed by fire.

The question arises whether, under all the facts in this case, there was a waiver of a punctual delivery of the vessel in the harbor of New York on the 17th of October, 1885, pending the negotiations for a sale, and if so, whether there was not an extension of time for such delivery until McKay had a reason- able opportunity to make it after the negotiations for a sale fell through. If there were such waiver and extension of time, a destruction of the vessel in the meantime, without the fault of McKay, would be a destruction before any breach of the contract on his part had occurred, and in such case he would not be liable. (See also *Lindsley* v. *Gordon,* 1 Shepley [13 Maine], 60.)

I have not felt it necessary to mention all the facts which might be urged as material upon the question of whether there were such waiver or not. I think the referee has come very near to a finding that there was. He has found a num- ber of facts upon this question, and in his conclusion of law he said that the company, prior to October 17, 1885, in no manner waived the return of said steamer by McKay to New York on October 17, 1885, other than by the delay occa- sioned by the negotiations for the purchase of the vessel by McKay, in which the company, McKay and the defendant participated in their efforts to perfect such sale.

The fact of waiver is not here squarely found; it is left somewhat in obscurity. The language seemingly indicates that the referee thought there was a waiver occasioned by the delay in the negotiations for a purchase of the vessel, but that such waiver was not material because the defendant, although

a surety, was a party to the cause which occasioned the delay and an efficient actor in it with the others. This might be a full answer to a defense based upon defendant's character of surety, where he sought to avail himself of the fact of granting delay to his principal as operating to his discharge as surety. This is not the nature of the defense.

If the delivery of the vessel on the 17th of October, 1885, had been waived by reason of these negotiations for its sale, and the time thereby impliedly extended until a reasonable time after their failure in which to make delivery in New York harbor, and if, during such extended time, the loss occurred by fire without the default of McKay, such loss would in that event occur before breach of the agreement to deliver, and the liability of McKay would not attach, and defendant would not be liable as his surety. The fact that defendant participated in the negotiations and thus was a party to the delay would not be material in this aspect of the case.

Although as I have said the finding of the referee as to the waiver may be somewhat obscure, yet if there be any obscurity it is fair to adopt that construction which on its face seems the most natural. It would appear from the language used by the referee that he thought the facts were such as to amount to a delay granted McKay in which to deliver the vessel, but as the delay was consented to if not brought about by the defendant himself, the delay constituted no defense. The case was not decided upon a correct basis as to the original liability of McKay on his contract to redeliver. That liability was assumed to be greater than I think it was, and the effect of the waiver as a defense, if it existed at all, was misapprehended and misapplied. It seems proper to grant a new trial for that reason.

Upon the new trial all the facts may be put in evidence regarding this question of waiver or extension of time and with reference to its proper effect upon the question of defendant's liability, separated from and regardless of the question of his assent to the delay already spoken of.

This is the result to be declared unless the fact that defend-

ant procured $17,000 of insurance on the vessel prior to her being sent north is to have an effect sufficient to maintain the judgment. The referee finds that the defendant caused the vessel to be insured against loss by fire for the sum of $17,000, and it was at the time of its destruction insured in favor of the defendant for that sum and the defendant collected the insurance moneys and kept and retained the same for his own use and benefit and still keeps and retains the same. It does not appear from this finding that defendant insured the vessel for the benefit of the owners. On the contrary the finding is that he insured it for his own benefit, and, inferentially, on account of some interest which he had or thought he had in it. One of the witnesses for the plaintiff testified to the fact that defendant said he had insured the vessel for whom it might concern for $17,000. The referee alludes in his opinion to the testimony of the defendant as to why he procured the insurance, but it nowhere appears that he effected it in any degree for the company. Another trial may develop the facts more in detail and the question for whom the insurance was obtained may be carefully investigated and its decision may have a most material effect upon the question of the understanding of the defendant as to the effect of the acts which are now claimed to constitute a waiver of delivery of the vessel. And if the insurance were made for the benefit of the owners, or for whom it might concern, or to indemnify the defendant for any liability of his by reason of the signing of his surety contract, it may be that the plaintiff would have an action to recover from the defendant the amount of the insurance as for money had and received by the defendant to his use, or the complaint might be amended by the insertion of proper allegations for the trial of that issue under these pleadings. The whole facts would then appear and the question might then be decided intelligently.

It may be that the defendant has collected moneys from the insurance company which in equity and good conscience he ought to pay to the plaintiff. We cannot say how this is upon the facts as now presented. It is safe to say that if it

be so and it shall so appear, he will be cast in judgment for the amount he has thus received.

The referee did not base any liability of the defendant upon the fact that he had procured this insurance for $17,000 upon the vessel. There is nothing in his finding of facts which would sustain such theory and the opinion delivered by the learned referee entirely disposes of any such ground. What if any liability does exist by reason of this insurance procured by defendant can more fully appear in another trial.

No question arises in this record as to where lies the burden of proof as to the loss of the vessel and its cause. The case was tried and decided upon a different theory and without reference to the question of burden of proof. It is not therefore necessary to now discuss it.

For the reasons already given the judgment should be reversed and a new trial granted, with costs to abide the event.

All concur.

Judgment reversed.