### LAKE MICHIGAN CAR FERRY TRANSP. CO. v. CROSBY et al.

#### (District Court, E. D. Wisconsin. April 8, 1901.)

1. SHIPPING—LOSS OF VESSEL BY CHARTERER.

The general rule that a bailee for hire is not liable for the loss of the property without his fault is applicable to charter parties for vessels, in the absence of any express provision therein affecting the question, other than the usual covenant for return of the property at the end of the term, which is a condition of all bailments, implied if not expressed.

2. SAME—NEGLIGENT LOADING OF BARGE.

Respondent, who was a vessel owner and contractor for harbor work, with large experience in the transportation of stone for such work on scows, chartered a barge from libelant to be used for carrying stone. The barge was not constructed for such service, and had never been used for it, and no representations were made by libelant except as to its general good condition and the quantity of lumber it had carried, but it was taken by the charterer after a personal inspection. A large load of stone was placed on the barge, and it was safely towed from Chicago to Racine, where the master of the tug, relying on the fact that it was not so low in the water as stone scows when loaded to full capacity, put on an additional load, which, and perhaps because of the manner of loading, caused the barge to collapse, and it was wholly lost. *Held*, that no warranty by the owner could be implied of the fitness of the barge for the particular service required of it by the charterer, and especially that it was equivalent in capacity and structure to a stone scow, and that its loss must be attributed to the negligence of respondent or his agents in loading it without reference to its construction, which they knew, or could have ascertained by inspection.

In Admiralty. Libel in personam to recover the value of a barge chartered to the respondents, and lost while in their possession and use.

The libelant was the owner of Barge A, a registered scow of peculiar construction, without sails or other motive power, which was designed for carrying loaded cars, and so used for a time, then adapted for transportation of lumber, and so employed by the libelant, in one instance carrying a return cargo of coal from the Lower Lakes. The registered capacity of the barge was 403 net tons; her length was 135 feet, and beam 34 feet. The respondent was a steamboat vessel owner of large experience, and a contractor in harbor work, which included the transportation of stone in scows for such

work. Desiring a barge for the carriage of stone to Racine and Milwaukee, he entered into negotiation with the libelant for Barge A, and after a personal inspection, and on representations of her lumber capacity, appears to have been satisfied that he could utilize the barge for that purpose. Thereupon the charter party in question was executed, whereby the respondent engaged to take the barge at South Chicago, where she then was, to paint her (with paint furnished by the libelants), "and use her during the charter in transporting stone from Chicago to Milwaukee and intermediate points, and return her to the owner at Chicago" at the expiration of five months. The rental was to be $1,500, and the contract provided an option of purchase at $4,500; the rental to apply as purchase money in the event of an exercise of such option. The barge was taken by the respondent accordingly, loaded at Chicago with stone,—approximately 150 cords, the definite amount not being shown,—and safely towed to Racine. This stone was all loaded on deck, as customary in the case of flat scows used in the stone trade, while this barge had an eight-foot hold, without such knees as entered into the construction of stone scows. Moreover, her sides were made of 6x8 timber, drift-bolted, extending above the deck, and making what is called a "rail" of three feet and ten inches; and the stone was so loaded as to use this rail by way of substitute for the wall of stone usually placed upon the sides of such cargo on flat scows. When the barge arrived in Racine, no part of the stone being taken off, she was towed up the river to receive the remnant of the cargo of another vessel; and after several cords, variously estimated, were placed along her port quarter, giving her a decided list, the tug was called to wind the barge for the purpose of receiving the remainder of the stone on her starboard side. In this maneuver the weight of the stone and the list of the barge caused a collapse,—the port side appearing to "flatten out," as described by some of the witnesses,—so that the barge was completely wrecked, and return to the owner became impossible.

C. E. Kremer, for libelant.
M. C. Krause, for respondents.

SEAMAN, District Judge. The primary contention on behalf of the libelant is that the terms of the charter are express and absolute for return of the barge or payment of the purchase price, and that the obligation of the charterer is not absolved by the fact that the barge was destroyed, even though it be without his fault. The cases of Moore v. Association, 41 C. C. A. 506, 101 Fed. 591, and Steele v. Buck, 61 Ill. 343, and the line of authorities reviewed in the opinions, are cited in support of this extreme view, while Young v. Leary, 135 N. Y. 569, 32 N. E. 607, is cited contra, as a leading case for the more liberal construction of a provision for return of the property. It must be noted that the Moore Case on the one hand, and the Young Case on the other, each present terms in the charter party which do not appear in the simple provision involved in this inquiry, and neither can be followed as a precedent unless its doctrine is equally applicable to any form of express promise to return the subject of bailment. Under the general rule of bailments, the bailee is not liable for loss without his fault; and no sound reason appears for excepting a charter party from such rule unless the liability as insurer is based on a provision stronger than the mere covenant for a return of the property at the end of the term,—a covenant which is clearly implied without expression. It is equally one of the terms of the contract, whether express or implied. As remarked in the great case of Rhode Island v. Massachusetts, 12 Pet. 657, 723, 9 L. Ed. 1233, 1260, "implication is but

another term for meaning and intention, apparent in the writing on judicial inspection." I am of opinion, however, that the question of liability does not hinge upon this contention, and that the libelant is entitled to recover the value of the barge by reason of its loss through the fault of the charterer. While the inquiry in that view is not free from difficulty, it is obvious from the testimony that the barge was laden to its full capacity for a deck load when it left Chicago, and the safe passage to Racine indicates that it was seaworthy for a reasonable cargo, at least for a cargo apportioned to the build and structure of the barge. It is true that the general doctrine is well settled that a charter by the owner implies a warranty on his part, unless the contrary appears, that the vessel is seaworthy,—is "tight, staunch, strong, and in every way fitted for the voyage." The Edwin I. Morrison, 153 U. S. 199, 210, 14 Sup. Ct. 823, 825, 38 L. Ed. 688, 692; Work v. Leathers, 97 U. S. 379, 380, 24 L. Ed. 1012. Whether this implied warranty is limited to defects or conditions which are latent and unknown to the charterer is not so clearly settled; but the reasons stated for the rule seem to be inapplicable to conditions which are both patent and known, and it is undoubted that the implication may be repelled by direct proof or by countervailing facts and circumstances. In any view, the degree or measure of seaworthiness which may be implied must be limited by such known conditions. The testimony in this case shows that the owners made no representations to induce the charter, beyond their remarks upon the amount of lumber the barge had safely carried as a cargo, and their expression of belief that it was in good condition. They had no knowledge, and made no pretense of knowledge, of the specific requirements for carrying stone, or of the customary means for its transportation or the method of loading. On the other hand, the charterer was a contractor in that line, of large experience, besides having built and owned vessels and stone scows for years. He made an examination of this barge for the express purpose of ascertaining its fitness for the work before entering into the charter party, and the owners understood that he had so satisfied himself of its fitness; and if the examination was imperfect, as the respondent now asserts, it was not for want of full opportunity. The structure of the barge, its depth of hold, means of bracing, and the absence of such knees as were customary in stone scows, were all open to observation. When the charter was made, he sent his master, with a tug, to take the barge and put on a cargo of stone, and, so far as appears, no instructions were given for further examination or as to the amount of load. The master thereupon loaded the barge with stone, all on deck, and at least to the level of the rail, with no supporting wall of stone on the sides, and without examining the structure to ascertain whether there was sufficient support for the great cargo, approximately 150 cords, for which deck room was found. Thus laden, the barge arrived at Racine with no apparent difficulty, but with no stress of weather for further test of its strength. After arrival, however, the attempt was made, apparently for convenience, and not as a necessary expedient, to take an ad-

ditional load from another vessel, which resulted in the disaster and loss of the barge; and the question thereupon arises whether the loss must be borne by the owners or by the charterer.

In thus venturing further load for the barge, the master relied solely upon the extent of side out of water,—showing about two feet below the deck line on arrival at Racine, according to his version,—as compared with the load line of an ordinary stone scow, which may be within a few inches of the deck. In the absence of peril or other conditions for action in extremis, it is plain that no ordinary criterion of water craft would justify the attempt in this instance. Was it authorized by the fact of the charter, under the circumstances shown? An affirmative answer to the inquiry thus presented would require, not only an implied general warranty that the barge was seaworthy for a reasonable cargo of stone, but an implied special warranty that it was equivalent in structure and relative capacity to the stone scow, and would carry its cargo in like manner. I am satisfied that no such warranty can be implied in this case; that the barge was laden to its utmost capacity before this additional burden was imposed; that it was the duty of the charterer to ascertain the apparent conditions for supporting a load so placed upon the deck; that his act in putting on the extra load at Racine was unwarranted and wrongful, and was the proximate cause of the loss, and entitles the libelant to a decree for the value of the barge.

On behalf of the respondent it is claimed that the disaster was caused by decay of the timbers and deck supports, and the testimony shows that portions of the timber, as dredged up from the wreck, were decayed to some extent; an exhibit piece being produced at the trial by way of corroboration. Much of the testimony as to the extent of this decay in the wreckage is unreliable for want of identification, as it is undisputed that large quantities of rotten timber were intermixed with the wreckage from old docks which were in course of removal at the same time; and the evidence as a whole is not convincing of deterioration from decay beyond the extent which should have been anticipated in a barge five years old, and so understood by the charterer. Moreover, the barge was thoroughly overhauled and fastened in 1899, when fitted for the lumber trade, and was then found to be sound; and the witnesses who were engaged in the wrecking operation found the timbers generally sound, with small percentage of decay. Such weakening of the barge as may have been due to this cause should have been considered by the charterer in estimating its strength for the unwonted strain put upon the deck and rail, with no part of the cargo in the hold, and furnishes no excuse for his negligence. Let decree be entered accordingly, with reference to ascertain the value of the barge.